530 F.2d 1035
 11 Empl. Prac. Dec. P 10,628, 174 U.S.App.D.C. 183
 David J. K. GRANFIELD, Appellant,
v.
The CATHOLIC UNIVERSITY OF AMERICA, a District of Columbia
Corporation.
Joseph A. BRODERICK, Appellant,
v.
The CATHOLIC UNIVERSITY OF AMERICA, a District of Columbia
Corporation.
 Nos. 74--1151, 74--1152.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 27, 1974.
Decided Jan. 29, 1976.
 
 Benjamin P. Lamberton, Cambridge, Mass., for appellant David Granfield.
 Samuel J. Murray, New York City, for appellant Joseph A. Broderick. William R. Joyce, Jr., Washington, D.C., was on the brief.
 Alfred L. Scanlan, Washington, D.C., with whom James R. Bieke, Stephen A. Trimble and Nicholas D. Ward, Washington, D.C., were on the brief, for appellee.
 Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge and JUSTICE,* United States District Judge for the Eastern District of Texas.
 Opinion for the Court filed by District Judge JUSTICE.
 JUSTICE, District Judge:
 INTRODUCTION:
 The Catholic University of America is a private educational institution located in Washington, D.C.[1] Historically, the University has maintained a disparity between the salaries which it has paid its lay faculty members and those paid to clerical faculty members.[2] According to the appellee, this lower salary scale or 'clerical discount' is a form of financial support for the University deliberately chosen by the Catholic Bishops.[3] It is the application of the clerical discount to their salaries which appellants attack in this civil action, both on constitutional and on contractual grounds. Prior to consideration of the appellants' first amendment contentions, we must assess the contractual claims of the priests in order to avoid, if possible, resolution of the controversy on constitutional grounds. See, e.g., Ashwander v. Valley Authority, 297 U.S. 288, 346--347, 56 S.Ct. 466, 482--483, 80 L.Ed. 688 (1936) (concurring opinion of Brandeis, J.).
 
 
 1
 Appellant David J. K. Granfield is a tenured professor of law at the University's Columbus School of Law, having been a member of the law school faculty since 1960. Granfield is a Roman Catholic priest and a member of the Benedictine Order. Appellant Joseph A. Broderick is also a tenured professor at the law school; he has been on the faculty since 1963, achieving tenure in 1969. Broderick is a priest in the Order of Preachers (Dominicans).
 
 THE CONTRACTUAL ISSUES
 Faculty Contracts
 
 2
 At Catholic University, the deans of the various schools are appointed by the President. The Dean of the Law School has authority to prepare a proposed budget for his school and to make recommendations concerning faculty salaries. The Executive Vice-President and Provost of the University must approve the proposed budget for the Law School; while this approval is not final, it provides a basis under which the Dean can make plans for the forthcoming academic year. Final authority over the budget resides in the Board of Trustees.
 
 
 3
 There are no formal written agreements between the University and the faculty members as to terms of employment. Official notification setting forth the terms of employment is by 'letter of appointment.'[4] Both appellants testified at the trial that they received letters of appointment at the beginning of each academic year in which there was some change in their rank or salary.
 
 
 4
 Sequence of Events Relevant to Claims of Both Appellants
 
 
 5
 As early as 1945, the University's Board of Trustees considered implementing a policy of salary parity between lay and clerical faculty. However, it was not until 1968 that efforts to achieve full parity appeared to come near realization. Against a background of 'institutional declericalization',[5] the priest-professors at Catholic University had accelerated their agitation for salary equalization. The Board of Trustees was aware that, if parity were not to be adopted, a number of clerical faculty members planned to leave the University to obtain full salaries elsewhere.[6] The faculty pressure culminated on February 8, 1968, when the Academic Senate[7] adopted a resolution requesting the Board of Trustees to institute a policy of parity and to 'implement this policy without delay'. Then, on September 12, 1968, the Finance Committee of the Board of Trustees reported that it 'favored putting the salaries of clerical members of the faculty on a parity with lay members.' At a meeting of the Board of Trustees on December 6--7, 1968, the Finance Committee, along with the Committee on Academic Affairs, resolved
 
 
 6
 to go on record as still considering the desired goal in faculty salaries to be the A level of the AAUP (American Association of University Professors) scale--not Plan A--including, eventually, placing the salaries of clerical members of the faculty on a parity with lay teachers. (Italics added.)
 
 
 7
 The minutes of this meeting show a notation immediately following the above resolution:
 
 
 8
 The Committees, however, faced the straitened 1969--1970 financial situation. Its realities make it impossible to implement Plan B as submitted by the Academic Senate.
 
 
 9
 At this meeting, the formal recommendation of the Committees was to retain the salary scale then in effect, using available funds for new personnel and merit increments for the faculty. This recommendation was approved by the Board of Trustees.
 
 
 10
 On December 12, 1968, Acting President Nivard Scheel reported to the Academic Senate that the Board of Trustees, at the December 6--7 meeting, had
 
 
 11
 approved a recommendation submitted jointly by its Committees on Academic Affairs and Finance that the AAUP 'A' scale, and parity of clerical and lay salaries be achieved as soon as possible. However, because of limited revenues, 'Plan B' cannot be achieved next year. Income from the rise in tuition will therefore be used to (a) maintain present salary scale, (b) permit recruitment of new administrative and faculty personnel, and (c) allow for merit increases to selected members of the faculty. (Italics added.)
 
 
 12
 This announcement by Acting President Scheel is at the heart of appellants' contention that the University promised adoption of a parity salary scale or made representations upon which they reasonably and detrimentally relied. On two subsequent occasions, Scheel addressed faculty meetings, expressing his understanding that parity had been accepted by the trustees in principle, and that implementation of the policy was a matter of immediate priority. Other members of the administration also believed that the Board of Trustees had adopted the principle of parity. Scheel's successor, President Walton, told a meeting of clerical faculty members that:
 
 
 13
 The University aims to raise their salaries to parity: to 75% of parity in 1971--72; 85% in 1972--73; and 100% in 1973--74. (Italics added.)
 
 
 14
 This representation is reflected in the minutes of the June 6, 1970, Board of Trustees meeting. On November 23, 1970, President Walton, writing to two priest faculty members of a committee the trustees had appointed to review the party issue, repeated the foregoing schedule and stated:
 
 
 15
 Since the principle of parity has been accepted by the Board I do not believe that the Board intends to repudiate that principle.
 
 
 16
 The move toward parity ended abruptly on December 12, 1970, when, spurred by an influential trustee, the Board passed a 'just compensation' resolution, which appellants characterize as, and appellee concedes was, a clear repudiation of parity as an official University policy.
 
 
 17
 Interpretation of the action taken by the Board of Trustees at the December 6--7, 1968, meeting is of great significance in evaluating appellants' claims. Clearly, Acting President Scheel and other administrators believed the University had committed itself to institute a parity salary scale, when feasible. The Administrative Bulletin is a publication compiled by the University's Office of the Provost, and is a general source of information for the University community. Its December 16, 1968, issue reported the following as to the Board's action at the December 6--7 meeting:
 
 
 18
 After consideration of faculty salary proposals presented at a previous meeting, the Board (1) affirmed acceptance as a goal of the A--level standard of the American Association of University Professors and elimination of the present disparity between scales for clerical and religious and for lay members of the faculty; (2) directed that normal salary increments under the present scale should be continued during 1969--70; and (3) directed, that after such increments, funds remaining from increased tuition income should be used for salaries of new administrative and faculty personnel and for merit increments to present members of the faculty. (Italics added.)
 
 
 19
 Based upon the announcements and representations of University officials mentioned above, both appellants contend, inter alia, that Catholic University should be estopped from denying that the clerical scale would no longer be applicable in determining their salaries. Appellants also contend they should be found to have enforceable contracts which provide for salaries unaffected by the 'clerical discount.'
 
 APPELLANT GRANFIELD
 
 20
 The district court was of the opinion that Father Granfield's strongest claim was based upon the doctrine of promissory estoppel. The elements of the promissory estoppel doctrine are authoritatively set forth in the Restatement, Contracts § 90 (1932):
 
 
 21
 A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.[8]
 
 
 22
 The Restatement formulation has been applied by this court. See, e.g., N. Lotterio & Co. v. Glassman Construction Co., 115 U.S.App.D.C. 335, 319 F.2d 736 (1963).
 
 
 23
 The promissory estoppel doctrine of the Restatement would seem to erect four conceptual hurdles for appellant Granfield. First, did the statements of the University officials constitute a promise? If so, should the University have expected that appellant would rely on the announcements, and 'act' or 'forbear' action of a definite and substantial nature? The next inquiry is whether the appellant actually relied on the promise to his detriment; that is, did he choose to remain at Catholic University instead of accepting opportunities elsewhere in reliance on the representation that he and the other clerics would receive a 'parity' salary? Finally, the court must ask whether injustice can be avoided only by enforcement of the promise.
 
 
 24
 The district court found that Father Granfield could not reasonably have relied on the 'amorphous statements' issued by the University as to parity. For example, the court noted that the Board of Trustees' Finance Committee report of December 6--7, 1968, spoke of parity as a desired goal. Acting President Scheel, on December 12, 1968, stated that the Board had approved a recommendation that parity be achieved as soon as possible. And on June 6, 1970, the Board was informed that President Walton had told the clerical faculty that the University aims to raise their salaries according to the reported timetable. The court rejected even the most definite statement made by President Walton as a sufficient basis for promissory estoppel,[9] viewing it as being limited to an expression of intentions rather than explicit promises, to be evaluated against a background of precatory statements concerning parity.
 
 
 25
 Although we may not have reached that result had this question come before us de novo,[10] we do not consider the district court's decision as clearly erroneous. As the district court found, 'the statements issued by the University as to parity were often confusing and possibly contradictory.' Its ruling that Father Granfield could not justifiably rely on these confusing statements subsumes a finding that no 'promise' was ever made by appellee on which Granfield could rely; one of the elements of a 'promise' is that it be 'communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon.[11] Such a holding is not clearly wrong in the institutional context of this case. The University is not a commercial seller promising immediate delivery as soon as a specific missing part becomes available. The quality of indefiniteness in the institutional context is underlined by the statement of Acting President Nivard Scheel that parity will be achieved as soon as possible but not next year,[12] since the Board of Trustees' judgment had been that the parity goal could give way to other expenditure priorities considered more pressing. The University's undertaking on parity thus is accompanied by a reservation for determination of when parity would be reasonable in its institutional circumstances.[13] The district court found that this undertaking lacked the specificity necessary for a promisee to justly expect and reasonably rely on performance, whether or not appellant relied in fact.[14]
 
 
 26
 It may well be that the district court was influenced in reaching its result of no promise generating justifiable reliance by its equitable obligation not to give effect to reliance unless necessary to avoid injustice. Equitable considerations properly include evaluation of the formality of the promise, whether there is a commercial setting and its nature, and whether there is unjust enrichment.[15] The appellants could reasonably have expected change as a probability without thereby becoming justified in the kind of monetary outlay or equivalent reliance that generates contractual remedy. We are not persuaded that the district court has wrought injustice. Nor is there merit in the other theories advanced by appellant as regards his contractual or entitlement claims.
 
 APPELLANT BRODERICK
 
 27
 In addition to the arguments advanced by Father Granfield, appellant Broderick sets forth certain relevant circumstances in support of his claims. Broderick was granted sabbatical leave for the academic year 1969--1970, and spent much of the period between January and June 1970 in Europe. While there, he corresponded with Clinton Bamberger, Dean of the Law School. It is evident from this correspondence that Father Broderick was seriously considering resignation. As the following recitation of their correspondence will manifest, Broderick was granted a salary increase and did return to the University.
 
 
 28
 Father Broderick argues that he reasonably interpreted the increase as an agreement to remove him from any clerical salary scale. The court below found otherwise; it was the court's conclusion that Broderick was promised only a salary increase--not a change of status, removing him from the clerical scale. The first relevant letter was written by Broderick on January 25, 1970. Dean Bamberger had requested the professor's comments in regard to the proposed budget, which scheduled the appellant's salary at $11,000. Broderick's response evidenced his displeasure with the proposed salary and stated, among other things, that he would prefer to preach, write, or teach theology or philosophy rather than teaching law under 'second class citizen' conditions.
 
 
 29
 Dean Bamberger responded on January 29, 1970. He wrote:
 
 
 30
 $11,000 is the maximum paid to University clerics under University policy. If I was not bound by that policy I would have recommended for you a salary of $21,500. That is the step at which you would be in the scale which I constructed to give me some rough guidance.
 
 
 31
 Bamberger further stated that he considered Broderick to be the very best professor at the law school, and that he wanted to do what he could to retain his services there. He concluded his letter with these comments:
 
 
 32
 If what you are saying is that you are not willing to accept the reduced salary, then I am sorely distressed because you will force me to accept your loss for ours which I cannot control. I will stand behind you 100% in any forum in which you want to raise the issue of parity for clerics. I do not know what else I can do.
 
 
 33
 Broderick responded on March 27, 1970. Again he intimated that it was likely that he would not return to the University. He added:
 
 
 34
 Furthermore, while I think the University's position on clerical salaries is vicious and demeaning to an educational institution--aside from its raw injustice--they do not need to change all that at once to meet my problem . . . No priest should be teaching at the non-Pontifical schools without being paid the same as any other human being there.
 
 
 35
 Broderick again wrote to Dean Bamberger on April 22, 1970. In this letter, Father Broderick reminded Bamberger that he had 'told (him) over a year ago that the only reason (he) would leave C.U. would be a failure to come up with equalization.' He spoke of being faced with 'a serious moral decision.'
 
 
 36
 The correspondence of greatest significance to appellant's promissory estoppel and contract claims was sent to Broderick by Bamberger on April 24, 1970. Stating that he was writing without taking time to review the correspondence and answer the points raised by appellant, Bamberger represented the following:
 
 
 37
 . . . I have just firmed up your salary for next year and want to get the news to you as soon as possible. The salary for next year for you will be $20,100--with no clerical discount. (Italics added.)
 
 
 38
 Father Broderick argues that he interpreted--and in light of the preceding correspondence, was entitled to interpret--this representation as an agreement by the University to grant him parity, contending that it was plain from the language and tone of his letters that nothing less than parity would satisfy him and induce him to return. However, the trial court found that (1) the April 24th letter promised a salary increase, not a removal from the clerical scale; and (2) that Father Broderick could not have justifiably relied on the letter as a promise of parity. Further, the court, without making a specific finding on the issue, pointed out that it was doubtful that Dean Bamberger, or Provost Nuesse, had the authority to remove appellant from the clerical scale.
 
 
 39
 It appears completely understandable that appellant Broderick believed he had been granted parity; he had clearly expressed his moral objections to unequal treatment for priest-professors, and the April 24 letter stated that no clerical discount would be applied to his salary for the forthcoming academic year. However, certain of the appellant's earlier statements intimated that he might return to the University if steps were taken short of abolition of the clerical scale.[16] In light of these intimations, the University could have concluded that a compromise, in the form of a salary increase, might induce the appellant to return to his teaching position and fight the policy he abhorred from within. In any event, Dean Bamberger's letter is subject to the interpretation that the University was offering only a salary increase for the next academic year.[17] The trial court found that this was the case, and that appellee had no promise of parity.[18] Hence, the court rejected both the contract and promissory estoppel claims of appellant, and we conclude that the finding upon which the court's holding was based is not clearly erroneous.
 
 FIRST AMENDMENT CONTENTIONS
 
 40
 Appellants Broderick and Granfield have fashioned arguments under the Religion Clauses of the first amendment by which they seek to have the court enjoin the operation of the clerical discount at Catholic University, whose status as a sectarian institution is unquestioned.[19] In many respects, the arguments rely on the interrelationship of the Religion Clauses.[20] For purposes of analysis, however, the contentions will be scrutinized separately.
 
 The Establishment Clause
 
 41
 In suggesting that the government grants to Catholic University violate the Establishment Clause, the appellants present serious allegations of impermissible entanglement between church and state, for the lawful bounds of aid to sectarian institutions are narrowly drawn. See e.g., Meek v. Pittinger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and cases therein cited. Thoroughly documenting Catholic University's receipt of funds from the Government, and other governmental relationships,[21] the appellants argue that, so long as the University subjects its cleric-professors to a discriminatory wage scale, it violates the mandates of the Establishment Clause.[22] Thus, while appellants are willing to construct an argument which includes the Establishment Clause as a constituent element, it is to be noted that they seek only incomplete and transitory enforcement of the prohibitions of the clause. We observe, for example, that no official of the government responsible for the administration of grants to appellee Catholic University has been made a party to the litigation.[23] Neither have the appellants sought a permanent injunction directed toward government officials or the University, or both, to prohibit continuation of the partial government funding of the institution, although injunctive relief of this type is ordinarily regarded as the appropriate remedy when such aid to a church-related educational body is in issue.[24] Moreover, appellants seek a ban against only one specific practice at the University, notwithstanding that other policies pursued by it might be equally suspect under close scrutiny for Establishment Clause transgressions.[25]
 
 
 42
 Since it fitted their theory of recovery, appellants did make the record crystal clear that the moneys received by the University from the government are treated as unrestricted funds by the former, thereby demonstrating that some of the government funds find their way into faculty salaries. Otherwise, however, they made little effort to disprove that the public grants are being utilized by the University 'exclusively for secular, neutral, and nonideological purposes.' Committee for Public Education v. Nyquist, 413 U.S. at 780, 93 S.Ct. at 2969. Nor did appellants make manifest whether 'an excessive government entanglement with religion' exists, walz v. Tax Commission, 397 U.S. 664, at 675, 90 before this court, for their briefs or if there is a failure by appellee and government officials 'to guarantee the separation between secular and religious educational functions and to ensure that . . . financial aid supports only the former,' Lemon v. Kurtzman, 403 U.S. at 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745. Such a showing would be at the heart of any constitutional violations that might exist.
 
 
 43
 It is extremely meaningful that the appellants and appellee do not have adverse views as to the propriety of the government grants per se. Appellee Catholic University obviously welcomes the aid. The appellants disapprove of the University's receipt of the grants only in the narrow and contingent circumstances presented by their contentions before this court, for their professed make it all too apparent that their professed opposition to government aid to the University will exist only for so long as it maintains the policy of denying them pay equal to that of their secular peers.[26] The manifest willingness of the appellants to become apostates from their claim under the Establishment Clause thus undermines their fitness to bring it before this Court in an adversary manner.
 
 
 44
 Under the terms of Article III, Section 2 of the Constitution, a federal court may act only in 'cases' and 'controversies'. It is clear that '(t)he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.' (Italics added.) Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240--241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). In Moore v. Charlotte-Mecklenburg Board of Education, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971), the Court dismissed an appeal wherein appellants had sought review of a three-judge district court's decision that a portion of a North Carolina anti-busing statute was unconstitutional.
 
 
 45
 At the hearing both parties argued to the three-judge court that the anti-busing law was unconstitutional * * * We are thus confronted with the anomaly that both litigants desire precisely the same result, namely a holding that the anti-busing statute is constitutional. There is, therefore, no case or controversy within the meaning of Art. III of the Constitution. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).
 
 
 46
 Id. at 47--48, 91 S.Ct. at 1293.
 
 
 47
 The situation with which this Court is confronted is more clouded than that faced by the Supreme Court in the Charlotte-Mecklenburg case. Appellants, rather than conceding the lack of dispute, have, in fact, created legal theories leading to the relief they desire. Nevertheless, it is clear that, although appellants purport to raise Establishment issues, they are devoid of a genuine, undeviating and wholehearted contrariety to the establishment of a religion at the University, insofar as it may be accomplished by a continuation of government aid to the institution. There is, therefore, a want of that concrete adverseness 'which sharpens the presentation of issues upon which the courts so largely depends for illumination of difficult constitutional question.' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). We are impelled to conclude, then, that sound principles of judicial restraint warrant no further consideration of this important constitutional issue.[27]
 
 Free Exercise Clause
 
 48
 In setting out his Free Exercise claim, appellant Granfield argues that
 
 
 49
 public aid to a university the management of which is . . . infused with religious considerations, is suspect under the Establishment Clause . . . (P) ublic aid is impermissible to a university that maintains a policy of keeping a substantial number of its faculty under religious discipline and control. Any aid to the University must run afoul of the Establishment Clause so long as this policy is maintained. It follows that this Court can enjoin (the University from) the maintenance of the clerical scale as an invasion of (appellants') Free Exercise Rights so long as any public funds flow to the University.
 
 
 50
 To the extent that appellant Granfield's claims rely on our finding an Establishment Clause violation, they must be disallowed for reasons stated earlier.
 
 
 51
 Appellants present alternative theories under which they seek relief pursuant to the Free Exercise Clause. Appellant Broderick utilizes the traditional government action theory (equivalent to state action in a fourteenth amendment context) to align the University's program of reduced pay scales for priest-professors with governmental policy. The government action label has been pressed against the conduct of appellee in the recent past. Spark v. Catholic University, 167 U.S.App.D.C. 56, 510 F.2d 1277 (1975).[28] While certain additional factors relevant to government contacts with the University are presented in this appeal, the Spark decision would seem to control as to the claims of government action presented by appellant Broderick. See also Greenya v. George Washington University, 167 U.S.App.D.C. 379, 512 F.2d 556 (1975).
 
 
 52
 As appellants point out, these holdings are subject to the significantly broader restraints concerning state action in the field of racial discrimination.[29] Reasoning from this, they argue that the Religion Clauses are 'preferred freedoms', and that the court accordingly should adopt a similar standard in the context of claims of interference with the free exercise of religion as that existent in cases involving invidious racial distinctions.[30] However, as hereafter shown, we find it unnecessary to resolve the issue as framed by appellants.
 
 
 53
 '( T)he Free Exercise Clause is writted in terms of what the government cannot do to the individual . . .' Sherbert v. Verner, 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963) (Douglas, J., concurring). The first amendment's proscription becomes specifically applicable when government attempts by law or other means to affect the freedom of those within a particular religious creed. See, e.g., Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Sherbert v. Verner, supra; Murdock v. Pennsylvania, 319 U.S. 105, 108, 63 S.Ct. 870, 87 L.Ed. 1292 (1934). The first amendment becomes relevant to a private institution's attempts to infringe upon the freedom of an individual to practice his religion only when a governmental entity is shown to have become significantly involved in the discrimination practiced by it. See Golden v. Biscayne Bay Yacht Club, supra, at 351, n. 18. Here, however, we have only the case of a particular religion through an affiliated educational institution, being charged with discriminating against certain of its own members, by those same members.[31]
 
 
 54
 We are thus not disposed to adopt the arguments of appellants. The salary scale for priests in a church-related institution clearly appears to be an internal matter of the religious institution affected. In other contexts, courts have traditionally refused to become involved in the resolution of internal religious questions.[32] Since we have concluded that the basic dispute is between sectarian authorities and members of the church's own religious orders,[33] the clerical discount here in issue does not involve the sort of restraint which is suspect under the Free Exercise Clause, for there is simply no private infringement of religious freedom to impute to the government.[34] The appellants' reduced salaries were set by an arm of their own religious organization, for the advancement of its own ecclesiastical objectives. Under these circumstances, a conclusion that appellants' Free Exercise rights were somehow violated by the government would be a paralogism.
 
 
 55
 Accordingly, we find the Free Exercise claims of appellants to be without merit. The wisdom--or lack thereof--of the salary policy in question must be resolved within the confines of the religious body involved. We expressly pretermit consideration of any other grounds raised by appellants, finding them likewise to be meritless.
 
 
 56
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(d)
 
 
 [1]
 The relationship between Catholic University and the Catholic Church is discussed in the section of this memorandum which concerns the appellants' constitutional claims. See n. 19, supra
 
 
 [2]
 The clerical pay scale is approximately 65% of the comparable 'lay scale'. However, since the lay salary scale at the University's law school is significantly higher and there is an $11,000 salary limit for clerics, the percentage is lower in the law school. Appellant Granfield, for example, receives a salary which is approximately 50% of the median salary paid to other full professors at the Law School. The clerical scale was applied, without exception prior to 1970, to all priests on the faculty, whether or not they took vows of poverty or were subject to federal taxation
 
 
 [3]
 The clerical discount is said to prevent competition for financial reasons among the diocesan clergy for appointments to the University and to deter faculty from declining to return to religious and charitable work in their home dioceses if needed. The Bishops, in choosing to promulgate the clerical discount, are apparently in accord with a tradition whereby church-related colleges have expected some measure of sacrifice from members of their faculty. Such sacrifices it is stated, help to permit the University to grant tuition discounts to clerical students, and to students preparing for the priesthood
 
 
 [4]
 The appointment letter is 'the equivalent of an employment contract.' Board of Regents v. Roth, 408 U.S. 564, 566, n. 1, 92 S.Ct. 2701, 2703, 33 L.Ed.2d 548 (1972)
 
 
 [5]
 During 1967--70 the University, which once functioned under the direction of the Roman Catholic Church, severed many of its ties with the Church. Only three schools now have 'pontifical status'--these being the schools of Theology, Philosophy, and Canon Law. In 1969 a layman became president of the University. In addition, the student body and faculty, which were once nearly exclusively Catholic, gained significantly in non-Catholic percentage
 
 
 [6]
 Bishop McDonald reported to the trustees that:
 There is a short supply of good teachers, and a highly competitive market with a rapidly growing student body. Secular as well as Catholic colleges and universities are willing to bid for qualified Catholic teachers, including priests. The situation has become critical and even desperate. (Minutes, Board of Trustees Meeting, April 28, 1965.)
 
 
 [7]
 The Academic Senate is responsible for the academic governance of the University. The body is composed of members of the faculty, including the president of the University, deans, and faculty representatives
 
 
 [8]
 The Restatement 2d of Contracts (Tent. Draft $2) provides:
 A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
 
 
 [9]
 See statement of November 23, 1970, supra
 
 
 [10]
 The court's finding on the making of a promise is subject to review under the clearly erroneous standard. Rule 52(a), Fed.R.Civ.P. The question for the appellate court under Rule 52(a) is not whether it would have made the same findings as did the trial court, but whether the appellate court is left with the definite and firm conviction that a mistake has been committed. Zenith Corp. v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); see also United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)
 
 
 [11]
 Corbin defines 'promise' as 'an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance and may reasonably rely thereon.' 1 Corbin on Contracts § 13 (1963)
 
 
 [12]
 See discussion supra
 
 
 [13]
 Cf. 1 Williston on Contracts § 40 (3d Ed. 1957):
 A promise is not too indefinite for enforcement because of the use of such inexact words of definition of the time of performance as 'immediately' (or) 'as soon as possible' . . . since the general interpretation of such stipulation is, as quickly as is reasonable under the circumstances.
 
 
 [14]
 The court also found that appellant Granfield did not demonstrate detrimental reliance of a definite and substantial nature. We are not required to review that finding
 
 
 [15]
 The Restatement of Contracts § 90, Comment (b) provides that:
 The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which evidentiary, cautionary, deterrent, and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as enforcement of bargains and prevention of unjust enrichment are relevant.
 
 
 [16]
 On one occasion, Father Broderick wrote to Dean Bamberger: 'The double-talk from the University is just too much. I would almost be prepared to stay if Nuesse or Walton would sign his name to a paper (to you or me) that no cleric at the University is getting the magic ceiling mentioned by you. It just isn't true and they know it.' In another communication, related earlier, wherein Father Broderick decried the injustice of the clerical discount, he commented: '. . . they do not have to change all that at once to meet my problem.' In this same letter, Broderick added that if he returned under unchanged circumstances he would be personally committed to (1) working under protest, claiming he was legally entitled to full compensation; and (2) commencing action within the American Association of University Professors to force defendant to pay full compensation or be discredited
 
 
 [17]
 The district court noted that his salary increase (to $20,100) was not the amount he had been informed he would be entitled to under a parity scale ($21,500). Also, the court emphasized that appellant, in his letter to Dean Bamberger of January 25, 1970, stated that he was waiting for final word 'as to what my salary for 1970--71' will be. (Italics added.)
 
 
 [18]
 The University has apparently chosen to freeze appellant Broderick's salary at the increased level
 
 
 [19]
 Until February 6, 1970, the University was governed by statutes, under which the University was strictly a pontifical institution, functioning under the direction of the Holy See. Thus, until 1968, the selection of the president of the University was subject to the approval of the Vatican, and all but a few of the University's Board of Trustees were members of the hierarchy of the Catholic Church
 In 1970, the statutes of the University were superseded, with approval of the Holy See, by new by-laws. The Board of Trustees now consists of 30 persons, 15 of whom are clerics, including five Cardinals. The local Ordinary, that is, the Archbishop of Washington, is ex officio the Chancellor of the University. As previously mentioned, three schools remain under pontifical direction: the Schools of Theology, Philosophy and Canon Law.
 The University derives approximately forty-three percent of its income from student and tuition fees. Approximately twenty percent of annual revenue comes from gifts and grants--primarily acquired through diocesan collections conducted by Catholic bishops. Much of the remaining funding is derived from governmental sources.
 The involvement and influence of the Catholic Church at Catholic University is obvious; in light of the above factors, we feel completely justified in characterizing Catholic University as a sectarian institution.
 Moreover, all parties to this appeal point up the sectarian character of the University--though for different reasons. Appellants argue, inter alia, that the government's partial funding of the University, as a church-related institution, amounts to the establishment of a religion--but only for so long as the University allegedly penalizes appellants' free exercise of religion qua priests by reducing their salaries qua professors. The University contends, as appellee, that none of the governmental aid is in violation of the Establishment Clause; that by reason of the University's sectarian nature, any governmental interference with the University's policy of paying its priest-professors at a reduced scale, based on considerations of church policy, would be a violation of the University's free exercise rights.
 
 
 [20]
 The first amendment provides, in pertinent part, that:
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .
 
 
 [21]
 Approximately twenty-five percent of Catholic University's annual income comes from the United States Government, as grants for instruction and research, funds for student aid, interest grants on notes, and reimbursement for indirect costs. Further support for appellants' government action argument is seen in the University's federal tax exemption as an educational institution and its eligibility to receive deductible contributions
 
 
 [22]
 The Supreme Court has written much concerning government aid or assistance to parochial and private schools. See generally Meek v. Pittinger, supra; Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Levitt v. Committee for Public Education, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2988, 37 L.Ed.2d 939 (1973); Norwood v,. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947)
 
 
 [23]
 Neither the Secretary of Health, Education, and Welfare nor the Commissioner of Education was made a party. The Office of Education, created by 20 U.S.C. Sec. 1221c(a), is, in the statutory language, 'the primary agency of the Federal Government responsible for the administration of programs of financial assistance to educational agencies, institutions, and organizations.' The Office is 'headed by the Commissioner of Education . . . who shall be subject to the direction and supervision of the Secretary (of Health, Education and Welfare).' 20 U.S.C. § 1221c(b). Cf. Provident Tradesmens Bank and Trust Co. v. Paterson, 390 U.S. 102, 111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); Brown v. Christman, 75 U.S.App.D.C. 203, 126 F.2d 625, 631--632 (1942); Boles v. Greenville Housing Authority, 468 F.2d 476 (6th Cir. 1972)
 
 
 [24]
 See, e.g., Committee for Public Education v. Nyquist, supra
 
 
 [25]
 Appellants' position that the federal aid runs afoul of the Establishment Clause only while the clerical discount remains in effect ignores the fact that Catholic University would remain a religious institution even if the discount is eliminated, and that the funds in issue are used for purposes other than faculty salaries
 
 
 [26]
 This point is particularly illustrated by appellant Granfield's brief, which raises the Establishment issue solely as an underpinning of his Free Exercise contentions
 
 
 [27]
 This holding is not explicitly mandated by the jurisdiction requirements of 'case or controversy.' However, '(j)usticiability is . . . not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . .' Poe v. Ullmann, 367 U.S. 497, 508, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). The court noted the following in McCahill v. Borough of Fox Chapel, 438 F.2d 213, 215 (3d Cir. 1971):
 Although this inquiry has commanded the attention of the Supreme Court both before and since the passage of the Federal Declaratory Judgment Act, the standards by which cases and controversies are distinguished from claims premature or insufficiently adverse are not susceptible of ready application to a particular case.
 To the extent that it can be said that the parties have 'adversary' positions, it is on a slight, incremental point--that even assuming the government is not involved in the religious auspices of the university through its funds and contracts, it becomes involved in the religious establishment because of the salary discount for clerical (as opposed to lay Catholic) members of the faculty. That point is without substance in our view, for reasons in large part indicated in our discussion of the internality aspect of the Free Exercise claim (pp. 1046, 1047).
 
 
 [28]
 In Spark, the Court had before it most of the government action factors which have been presented to this court. The appellant had alleged a first amendment 'free expression' claim, and the court refused to find that the state involvement was sufficient to sustain federal jurisdiction
 
 
 [29]
 It has increasingly become clear that, with respect to racial discrimination, courts are willing to condone less state involvement than would be permitted in other contexts. See, e.g., Greenya v. George Washington University, supra, 167 U.S.App.D.C. at 383, 512 F.2d at 560; Greco v. Orange Memorial Hospital Corp., 513 F.2d 873 (5th Cir. 1975); Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970) (Friendly, J., concurring); Powe v. Miles, 407 F.2d 73, 82 (2d Cir. 1968). Commentators have noted this distinction. See Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Colum.L.Rev. 656, 661 (1974); Comment, State Action and the Burger Court, 60 Va.L.Rev. 840, 850 (1974)
 
 
 [30]
 Such a view was adopted by the court in Golden v. Biscayne Bay Yacht Club, 521 F.2d 344 (5th Cir. 1975). In Golden it was held that a private yacht club's discriminatory racial and religious membership policies were within the proscription of the Fourteenth Amendment. As to the claim of religious discrimination, the court commented as follows:
 We believe, in this context, religious discrimination against the Jewish applicant carries the same stigma of inferiority and badge of opprobrium that is characteristic of racial discrimination. Accordingly, we apply the well developed standards utilized in the racial discrimination setting to both litigants, for the gravity of harm is exactly the same as to both plaintiffs and there exists no rational basis for distinguishing between them by allowing relief as to one while denying it to the other. (Footnotes omitted.)
 Id. at 351.
 
 
 [31]
 Appellants contend that the special pay scale diminishing their salaries because they are clerics represents the same type of sanction upon their free exercise of religion as would a fine levied against them for being Catholic priests
 
 
 [32]
 Cf. Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 115, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Gonzales v. Roman Catholic Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929); Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed.2d 666 (1874); Kings Garden, Inc. v. F.C.C., 162 U.S.App.D.C. 100, 498 F.2d 51, 56 (1974) cert. denied 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); Simpson v. Wells Cement Corp., 494 F.2d 490 (5th Cir. 1974)
 Justice Brennan, concurring in Abington School District v. Schempp, 374 U.S. 203, 243, 83 S.Ct. 1560, 1582, 10 L.Ed.2d 844 (1963) discussed the 'internality doctrine':
 One line of decisions derives from contests for control of a church property or other internal ecclesiastical disputes. This line has settled the proposition that in order to give effect to the First Amendment's purpose of requiring on the part of all organs of government a strict neutrality toward theological questions, courts should not undertake to decide such questions. These principles were first expounded in the case of Watson v. Jones, 13 Wall. 679 (20 L.Ed. 666) which declared that judicial intervention in such a controversy would open up 'the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination . . .' 13 Wall., at 733. Courts above all must be neutral, for '(t)he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.' 13 Wall., at 728.
 See also Note, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv.L.Rev. 1142 (1962); Comment, Judicial Intervention in Disputes Within Independent Church Bodies, 54 Mich.L.Rev. 102 (1955); Comment, The Power of Courts Over the Internal Affairs of Religious Groups, 43 Calif.L.Rev. 322 (1955).
 Courts have, on occasion, involved themselves in ecclesiastical affairs where a compelling governmental interest in the regulation of public health, safety and general welfare has demanded court attention. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Braunfield v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).
 
 
 [33]
 The origin and purpose of the clerical discount is discussed in n. 3, supra
 
 
 [34]
 'The Free Exercise Clause . . . withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion.' Abington School District v. Schempp, supra, at 222--223, 83 S.Ct. at 1572 (1963)