Raymond A. OATES, Plaintiff,

v.

The TEAMSTER AFFILIATES PENSION PLAN et al., Defendants.

Civ. A. No. 78–2399.

United States District Court, District of Columbia.

Nov. 16, 1979.

Michael Nussbaum, Martin R. Baach, Nussbaum & Owen, Washington, D. C., for plaintiff.

M. J. Mintz, George T. Boggs, Dickstein, Shapiro & Morin, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

AUBREY E. ROBINSON, Jr., District Judge.

Before the Court are Cross Motions for Summary Judgment in an action brought by Raymond Oates against the Teamsters Affiliated Pension Plan (TAPP), the Trustees of said Plan, and the International Brotherhood of Teamsters (IBT or Teamsters). Plaintiff is suing Defendants for (1) violation of the Employees Retirement Income Security Act (ERISA), (2) breach of contract, (3) promissory estoppel, and (4) conversion. All intra-union remedies have been exhausted. Jurisdiction is predicated upon 29 U.S.C. § 1132, 28 U.S.C. § 1332, and the doctrine of pendent jurisdiction.[1]

The undisputed facts of this case may be summarized as follows:

From 1962 to 1975, Plaintiff was President of Teamster Local 158. From 1945 to 1962, Oates was employed by the Seafarers International Union (SIU or Seafarers). At the end of the Korean War, Oates organized the United Industrial Workers (SIU/UIW),

a division of the SIU containing approximately 1,200 members. The Seafarers as a whole has approximately 69,000 members.

While Oates was organizing the SIU/UIW, the Seafarers and the Teamsters were at war. In 1961 James Hoffa, then President of the IBT, met Oates, urging him to join the Teamsters and bring with him his SIU/UIW workers. Under applicable labor law, Oates could only bring with him those workers whose employment contract had expired (approximately 260). Hoffa wanted Oates to form a new Teamster local, using the eligible workers; other SIU/UIW members would join Local 158 as their contracts expired. Oates agreed to Hoffa's plan, and the switch was effectuated successfully. The new local negotiated its first collective bargaining agreement within a week after its inception. As their employment contracts expired, SIU/UIW members joined Local 158. By the time Oates retired in 1975, the Local had over 4,000 members.

In 1962, the Teamsters recognized Oates' achievement, stating that the formation of Local 158 represented "a mass exodus of officers and rank-and-file from SIU into the IBT," and that "the officers of SIU who came over to the Teamsters have firm commitments from others of the SIU membership . . . that they too will disaffiliate with the SIU and become Teamsters as their contracts expire."[2]

At the Hoffa-Oates meeting, the Teamster President expressly promised Plaintiff that he would receive credit for his years of service with the SIU in determining his Teamster pension. The promise was made in front of Raymond Cohen (the Teamster who initiated Hoffa's contract with Oates). His affidavit is part of the record, and his credibility is unquestioned. Subsequent to ratification of TAPP, Hoffa reiterated the promise in the presence of Stanton Miller and James O'Neill. Their affidavits are part of the record, and their credibility is unchallenged.

1. See *Hurn v. Retirement Fund Trust of Plumbing, Heating and Piping Industry of Southern California*, 424 F.Supp. 80 (C.D.Cal.1976).

2. See *The Philadelphia Inquirer*, February 2, 1962; *The New York Times*, February 3, 1962.

When Hoffa initially made the promise, he was the highest ranking Teamster official. At that time the Plan was being prepared. When it became effective, Hoffa became a Trustee. After he became a Trustee, Hoffa reaffirmed the promise. The SIU did not effectuate a similar pension plan until 1969, and had no plan under advisement during the period in question.

From July 3 to July 7, 1961, the IBT held a convention. It is at this convention that the Plan was first discussed. One of the delegates asked President Hoffa "I happen to be one of the many delegates attending this convention that were affiliated with another International Union. We went over to the Teamsters Union. . . . Do I understand that under this plan the time that we were paid officers of other local unions and transferred to the Teamsters will count under this pension plan?" Hoffa replied "That is correct." The Plan then discussed was the same Plan subsequently enacted.

The Plan, as enacted in 1962 and as officially explained to beneficiaries,[3] stated in pertinent part:

> You must have at least twenty years of full time employment with an affiliate of IBT, including full time employment with any labor organization prior to the merger or affiliation with IBT of all or a subtantial part of its membership.

> If you become a member of the Plan, you will receive credit for years of full time employment which have been accumulated prior to January 1, 1962.

Affiliate, as used herein, means any local union. . . .

> Costs and Benefits: Your International Union pays the entire cost. You pay nothing.

The Plan, as amended in 1975 and as officially explained to beneficiaries,[4] reflects the following relevant changes:

> You must have at least fifteen years of full time employment with an Affiliate of IBT, including full time employment prior to January 1, 1962 with any labor organization which merged or became affiliated with IBT.

> Affiliate, as used herein, shall mean any local union. . . . This enumeration shall not preclude the General Executive Board from certifying to the Trustees any other entity of Teamsters as Affiliates under this Plan.

## I. Issues Arising Under ERISA and the Plan

The IBT Pension Plan meets the definition of "employee pension benefit plan" contained in ERISA.[5] As such, ERISA is the controlling statute.[6]

■ This case is before the Court because the Trustees of the Plan denied Oates a pension after January 1, 1975.[7] This ruling must prevail unless it was arbitrary and capricious,[8] in light of the legislative purposes behind ERISA[9] and the legitimate purposes of the Plan.[10] Both of these purposes favor potential beneficiaries, however.[11] Thus, while the arbitrary and capri-

---

3. Explanatory Booklet. This is to be considered in evaluating the Plan. *See Needham v. American Bankers Assn.*, 110 U.S.App.D.C. 23, 288 F.2d 425 (D.C.Cir.1961). Defendants do not dispute the validity of the Explanatory Booklet.

4. *Id.*

5. 29 U.S.C. § 1002(2).

6. 29 U.S.C. § 1003. This is not contested by either party.

7. A cause of action under ERISA accrues at the time Trustees of a pension plan rule on an application for benefits, *Reiherzer v. Shannon*, 581 F.2d 1266, 1272 (7th Cir. 1978); and ERISA only applies to causes of action that have accrued after January 1, 1975. *See* 29 U.S.C. § 1144.

8. *Norton v. I.A.M. Natl. Pension Fund*, 180 U.S. App.D.C. 176, 553 F.2d 1352 (D.C.Cir.1977).

9. *Reuther v. Trustees of Trucking Emp.*, 575 F.2d 1074, 1076–1077 (3d Cir. 1978); *Mosley v. Natl. Maritime Union*, 438 F.Supp. 413 (E.D.N. Y.1977).

10. *Norton v. I.A.M. Natl. Pension Fund, supra.*

11. *See Norton, supra; Reuther, supra* ; and 29 U.S.C. § 1001.

cious standard is to be applied, and Trustees' findings are to be upheld if "made rationally and in good faith," [12] a decision unjustly precluding a legitimate beneficiary from collecting his pension would be contrary to the policies of both ERISA and the pension plan, and therefore arbitrary and capricious.

Whether Plaintiff is entitled to a pension under ERISA depends upon "the terms of the plan." [13] Determining Oates' rights under the Plan requires (1) defining "labor organization" and "substantial," and (2) ascertaining how many people from the "labor organization" Oates enrolled in IBT.

■ The Trustees defined "labor organization" in the instant case as the SIU. This is contrary to the intent of the Plan. The crediting provision in the Teamster Plan was effectuated primarily to induce local unions affiliated with large unions to disaffiliate from their parent union and join the Teamsters. The Plan provides for this by (1) defining "labor organization" as an organization which *became* an affiliate, and (2) defining "affiliate" as *including* labor organizations that established ties with the IBT. Labor organizations, therefore, must be defined in the context of TAPP's definition of affiliate and the specific affiliate created.

Because labor organization is a subpart of affiliate, it is incongruous to define the former as larger in size than the latter. Since affiliate is defined to include union locals and the prospective affiliate in this instance was also a local, the Trustee's use of the Seafarers in the instant case runs counter to the intent of the Plan.[14]

This analysis is supported by the National Labor Relations Act (NLRA) which defines labor organization as "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers . . . ." [15] While this definition is not controlling, it has existed in labor law since 1935, seventeen years before TAPP was effectuated. Since Defendants are experts in the field of labor relations it may be inferred that this definition was known to them. It is inconceivable that TAPP's definition of labor organization would differ so radically from the definition contained in the NLRA, without further elaboration. This is particularly true given the purpose behind the crediting provision and the language of the Plan.

The SIU/UIW was a labor organization as defined by both the NLRA and TAPP. It negotiated collective bargaining agreements independent of the Seafarers and dealt with all other aspects of employer/employee relations. Furthermore, the SIU/UIW was the organization subject to the resulting affiliation. The only reason the Trustees did not define labor organization as that organization in the instant case was to deny Oates a pension. This was contrary to both ERISA and TAPP, and thus arbitrary and capricious.[16]

It is clear that Oates brought with him a "substantial" portion of the SIU/UIW. All of the original members of Local 158 were brought by Oates to the Teamsters when their collective bargaining agreement expired. This constituted more than 99% of the eligible employees. Moreover, as other SIU/UIW workers became eligible to join the Teamsters, they did so, until virtually all members of the UIW were enrolled in Local 158. If the Trustees had performed an analysis of Plaintiff's application consistent with the legitimate purposes of the Plan, they would have found (1) that Oates' labor organization was the SIU/UIW, and (2) that a vast majority of the UIW mem-

---

12. *Riley v. MEBA Pension Trust*, 570 F.2d 406, 410 (2d Cir. 1977).

13. 29 U.S.C. § 1132(a)(1)(B).

14. The Plan deals with the possibility of mergers as well as affiliations. If Plaintiff had attempted to effectuate a merger between the SIU and IBT, the Trustees' findings in the instant case would have been consistent with TAPP and not arbitrary and capricious.

15. 29 U.S.C. § 152(5). *See NLRB v. Cabot*, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1965).

16. *Norton v. I.A.M. Natl. Pension Fund, supra.*

bers joined Local 158. The Trustees' failure to make such findings was arbitrary and capricious.[17] It is clear that Plaintiff is entitled to a pension under the Plan.

The amount of Oates' entitlement under the Plan is unclear, however. Plaintiff worked for the SIU for seventeen years, and claims that this should guide an entitlement determination. As has been noted above, however, the "labor organization" Oates caused to affiliate with the IBT was the SIU/UIW. It is his tenure with that organization that provides the yardstick for measuring Oates' entitlement under the Plan. Determining the duration of Plaintiff's tenure with the SIU/UIW is unnecessary, however, because Plaintiff is entitled to the full seventeen years under the doctrine of promissory estoppel.

II. Applicability of Promissory Estoppel

■ While ERISA governs all of Plaintiff's claims arising out of the terms of the Plan, it is apparent that it is inapplicable to the instant claim. ERISA provides that "This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975."[18] The Supreme Court has asserted that "ERISA did not become effective until January 1, 1975 and expressly disclaims any effect with regard to events before that date . . ."[19] Since Hoffa's promise was made and reiterated prior to that date, ERISA is inapplicable.

■ Plaintiff's promissory estoppel claim rests on the applicability of state law, either as the law of the case,[20] or as a framework for fashioning federal common law.[21] In either event, promissory estoppel may only be applied if (1) it most fairly accommodates the interests of all affected parties— the beneficiaries, participants, and fiduciaries of and contributors to ERISA Trusts,[22] and (2) its application does not undermine federal law.[23]

The interests of all the parties would most fairly be accommodated by the application of promissory estoppel in the instant case. Unlike many pension plans, TAPP receives no contributions from beneficiaries or participants. Thus, there is no conflict between Oates and other potential recipients and they are unaffected by this ruling. Moreover, Hoffa was President of the IBT when the promise to Oates was made and the Teamsters are the sole contributors to TAPP. Thus, it would not be unfair to the Plan's donors to apply promissory estoppel principles herein. Finally, it was reasonable to assume that Hoffa's promise would be honored by TAPP Trustees. After Hoffa became a Trustee he ratified the promise. It therefore would not be unfair to the fiduciaries of TAPP to give effect to the doctrine of promissory estoppel.

Defendants do not contest the fairness of applying promissory estoppel. Rather, they assert that such application would undermine federal law because (1) while ERISA possesses an "equitable character,"[24] Congress specifically precluded its application to events occurring before January 1, 1975, (2) this Court should therefore apply the labor law that was in effect prior to ERISA, namely, the Labor Management Relations Act (LMRA), (3) because the LMRA is a statutory scheme that outlines Plaintiff's rights and obligations, federal common law, rather than state common law, applies, (4) all of the Courts considering the application

---

17. *Id.*

18. 29 U.S.C. § 1144(b)(1).

19. *Malone v. White Motor Corp.*, 435 U.S. 497, 499, 98 S.Ct. 1185, 1187, 55 L.Ed.2d 443 (1978).

20. *Scheuer v. Central States Pension Fund*, 358 F.Supp. 1332 (E.D.Wis.1973).

21. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Rehmar v. Smith*, 555 F.2d 1362 (9th Cir. 1976).

22. *See Bacon v. Wong*, 445 F.Supp. 1189, 1192 (N.D.Cal.1978); *Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307 (8th Cir. 1979).

23. *See Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

24. *Reuther v. Trustee of Trucking Emp., supra,* at 1078–1079.

of promissory estoppel to denial of pensions under the LMRA have applied federal common law and rejected that doctrine, and (5) to preserve the actuarial soundness of pension plans, promissory estoppel must be rejected.

Defendants' first point is well taken; this Court is not applying ERISA to the instant claim. Their second point must fall, however. Prior to ERISA, Congress did not pre-empt state regulation of pension plans. As the Supreme Court has noted, Congress "endeavor[ed] to leave regulatory responsibility to the States."[25] Such regulation was upheld by that Court even though it intruded on labor management relations.[26] Furthermore, there is no pressing federal interest here. The TAPP is completely funded by the IBT; no employee management relationship is present. Employer/employee relations are at the heart of the LMRA and its application is inapposite here. Thus, state common law, rather than federal common law, should be applied.[27] Regardless, it is evident that state law may be employed to fashion federal common law, so long as state law is not inconsistent with federal law.[28] As the following will delineate, promissory estoppel is not inconsistent with any federal statute in this area, and is not *per se* precluded by federal common law.

Promissory estoppel is inconsistent with the LMRA in certain areas. In those instances the doctrine has been and must be rejected. The LMRA states, for example, that employer funding of union pension funds is legal only if eligibility provisions are set forth in a written agreement between the union and the employer.[29] If no written provision entitles a plaintiff to a pension, utilizing promissory estoppel would

force the Trustees to perform an illegal act. This was the basis for rejecting estoppel principles in several of the cases cited by Defendants.[30] Their analysis is inapposite here for three reasons, to wit: (1) This is a union funded pension program. Defendants have not even alleged that all aspects of the program must be in writing, or that utilizing promissory estoppel principles would violate some law; (2) assuming *arguendo* that eligibility provisions must be in writing, Plaintiff has unquestionably met the written eligibility requirements of TAPP. The Trustees paid Plaintiff a lump sum, indicating that he was eligible for some benefits; the first section of this Opinion indicates that under the terms of the Plan Oates is entitled to a pension. Thus, the issue here is not Plaintiff's eligibility, it is the extent of his entitlement (this need not be in writing); and (3) regardless of the entitlement/eligibility distinction, under TAPP Defendants may certify *any entity* as an affiliate and thereby render officers formerly employed by that affiliate eligible for benefits. Thus the SIU could be certified as an affiliate for the purposes of Oates' eligibility, and, under the written terms of the Plan, Plaintiff would be entitled to all seventeen years of SIU membership. By applying promissory estoppel, this Court can and does compel the Defendants to honor Hoffa's promise and construe the SIU as an affiliate for the purposes of this dispute.

Under the provisions of the LMRA employers may not use an employer/employee fund to set up pensions for themselves.[31] Thus, utilizing promissory estoppel to order the payment of a pension to an employer would compel an illegal act. This was the basis for rejecting estoppel principles in

25. *Malone v. White Motor Co., supra*, 435 U.S. at 507, 98 S.Ct. at 1191.

26. *Id.*, at 504–505, 98 S.Ct. 1185.

27. *See Erie v. Tompkins*, 304 U.S. 64, 71, 58 S.Ct. 817, 82 L.Ed. 1188 (1973).

28. *Textile Workers v. Lincoln Mills, supra*.

29. 29 U.S.C. § 186(c)(5)(B).

30. *Thurber v. Western Conference of Teamsters' Pension Plan*, 542 F.2d 1106 (9th Cir. 1976); *Reiherzer v. Shannon, supra; Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968).

31. 29 U.S.C. § 186(c)(5)(6).

other cases cited by Defendants.[32] Those cases are inapposite because (1) the TAPP is solely funded by the Teamsters, and thus has little to do with employer/employee relations, and (2) Plaintiff was a labor leader, not an employer.

Finally, Defendants point to cases that reject promissory estoppel because of their factual patterns.[33] Implicit in their holdings is that in the right factual setting, promissory estoppel should be applied. These cases have uniformly rejected estoppel for one reason other than illegality—the lack of justifiable reliance. Those Courts uniformly held that reliance is unjustified when the promisor is not a Trustee, but is merely an agent of the union without either actual or apparent authority to make the relied upon promise. The facts of the instant case require a different finding as a matter of law.

In all of the cases cited by Defendants, there was no relationship between the promisors and the Trustees of the given pension plan. The plans were not controlled by union members and were not financed by unions. In the instant case, however, there is a very close relationship between TAPP and the Teamsters. The three TAPP Trustees are high ranking officers in the IBT; one is the President of the Teamsters. The TAPP crediting provision was effectuated to induce new membership into the Teamsters, and the union pays for all the benefits. Moreover, the promisor was not only the President of the Teamsters when he made the promise, but was a Trustee when the promise was ratified. Given the relationship between TAPP and the Teamsters, and the power wielded by President Hoffa when the promise was made and ratified, it would be absurd to

suggest that Hoffa did not have the actual or apparent authority to make the promise. Plaintiff's reliance was clearly justified.

Defendants' final argument against the applicability of promissory estoppel is based on policy. They assert that estoppel should never be applied to pension cases because it would upset the actuarial soundness of the plans. While their contention might be true in certain instances, it has little relevance to the instant case. TAPP is not based on contributions from participants. Thus, the complex relationship between periodic payments and eventual entitlement is not present. Furthermore, the Plan provides broad discretionary powers for defining "affiliate." That definition in turn ascertains individuals' eligibility and entitlement. Because of this structural setup, the amount of future outlays required by the Plan is not ascertainable. A high degree of actuarial fine-tuning must be present, however, if a plan's soundness would be upset by one unexpected beneficiary. Since this degree of accuracy is not present in TAPP, public policy does not mitigate against this Court's implementation of promissory estoppel.

### III. Promissory Estoppel Effect

█ Promissory estoppel requires the enforcement of a promise if (1) the promisor expected or should have reasonably expected the promise to induce action of a definite and substantial character by the promisee,[34] (2) which in fact induced such action, and (3) in circumstances requiring the enforcement of the promise to avoid injustice.[35] TAPP dictates that interpretation and validity of the Plan are governed by Michigan law. That State applies the above definition of promissory estoppel,[36] as does the District of Columbia.[37]

---

**32.** *Melang v. IBEW Pacific Coast Pension Fund*, 93 LRRM 2389 (W.D.Wash.1976); *Dohrer v. Wakeman*, 14 Wash.App. 157, 539 P.2d 91 (C.A.Wash.1975).

**33.** *Knoll v. Phoenix Steel Co.*, 465 F.2d 1128 (3d Cir. 1972); *Chamberlin v. Bakery and Confectionary Union*, 99 LRRM 3176 (N.D.Cal. 1977). *See* cases in note 32, *supra*.

**34.** This Court does not preclude use of estoppel by a third party; it merely notes that the issue is irrelevant here.

**35.** *See* Restatement Contracts § 90.

**36.** *Assn. of Hebrew Teachers v. Jewish Welfare Federation*, 62 Mich.App. 54, 233 N.W.2d 184 (1975).

When Hoffa promised Plaintiff coverage under TAPP for his SIU years, the Teamsters and SIU were at war. Since the SIU had no pension plan at the time of the promise, coverage under the proposed Teamster Plan would certainly induce substantial action on Plaintiff's part. It is clear that Hoffa expected Oates to join the IBT and bring as many SIU/UIW members as possible into the Teamsters. In the context of the union war ensuing when the promise was made, the action Hoffa expected was both definite and substantial.

Oates performed all the action requested by Hoffa, and Defendants do not assert otherwise. Rather, they contend that Oates did not detrimentally rely on Hoffa's promise because the SIU did not have a pension at the time Hoffa made the promise. There is no case law supporting Defendants' concept of detrimental reliance. Courts do not compare a party's past options with his action to determine detriment. Rather, when the promise is for future performance (as it was in the instant case) the detriment is suffered when the actions desired are performed.[38] Oates' detrimental reliance became manifest when Local 158 was created.

Finally, justice requires application of promissory estoppel in the instant case. To satisfy the final requirement posited in the Restatement, four criteria should be weighed, to wit: (1) the reasonableness of the promisee's reliance, (2) the performance of definite and substantial acts, (3) the form of the promise, and (4) unjust enrichment.[39] As has already been noted, Oates' reliance was reasonable, and required the performance of definite and substantial acts. The "form" of the promise must be scrutinized to ascertain its existence and meaning. Both parties were labor leaders negotiating a proposed affiliation. The promise was made in circumstances reflecting the contemporary labor environment. Three witnesses, whose veracity is unchallenged, have attested to the existence and content of the promise. The circumstances unwaveringly indicate that the promise was made, that it was made with the intent to induce substantial and definite action, and that such action was performed. Because there are no restitutionary aspects present in the instant case, the concept of unjust enrichment is irrelevant.

ACCORDINGLY, it is by the Court this 16th day of November, 1979,

ORDERED, that Plaintiff's Motion for Summary Judgment is hereby GRANTED, and Defendants' Motion for Summary Judgment is hereby DENIED.

---

37. *Hofbrau v. Hyman Constr.*, 156 U.S.App. D.C. 253, 256, 480 F.2d 1145, 1148 (D.C.Cir. 1973).

38. *See* Restatement Contracts § 90; Corbin on Contracts § 122.

39. *Granfield v. Catholic University of America*, 174 U.S.App.D.C. 183, 530 F.2d 1035 (D.C.Cir. 1976), *cert. den.*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1977).