# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-CA-00826-COA

**NICHOLAS MARK ARONSON**                              **APPELLANT**

**v.**

**THE UNIVERSITY OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 04/20/2000 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN L. MAXEY II |
| | JOHN F. HAWKINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | MARY ANN CONNELL |
| | CHARLES THOMAS RUBISOFF |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR FAILURE TO STATE CLAIM UPON WHICH RELIEF CAN BE GRANTED IS GRANTED. PLAINTIFF'S COMPLAINT IS HEREBY DISMISSED WITH PREJUDICE. |
| DISPOSITION: | REVERSED AND RENDERED IN PART AND REMANDED IN PART - 10/02/2001 |
| MOTION FOR REHEARING FILED: | 10/31/2001; denied 1/8/2002 |
| CERTIORARI FILED: | 2/6/2002; granted 6/27/2002 |
| MANDATE ISSUED: | |

EN BANC:

KING, P.J., FOR THE COURT:

¶1. Nicholas Aronson has appealed the Chancellor's grant of a directed verdict to the University of Mississippi, predicated upon his failure to state a claim upon which relief can be granted. Aggrieved by that action, Aronson has appealed and presents two issues, for this Court's consideration which we state verbatim:

**1. Whether the Chancery Court erred as a matter of law in concluding, upon considering Defendant's Motion to Dismiss at the close of Plaintiff's case in chief, that no contract was formed between the parties.**

**2. Whether the Chancery Court erred as a matter of law by granting Defendant's Motion to Dismiss at the close of Plaintiff's case in chief upon concluding that Plaintiff failed to establish a claim under the equitable doctrine of estoppel.**

¶2. Finding error, we reverse, render and remand.

## FACTS

¶3. Aronson, a resident of Marietta, Georgia, is an undergraduate student at the University of Mississippi. During his senior year in high school, Aronson and his family sought information on several universities and colleges for his continued education. The initial method by which this information was sought was the internet.

¶4. As Aronson and his family looked at the various university and college websites, when they found what was considered a compatible school, they requested a college catalog. One of the primary points of consideration in determining compatibility, was school costs and the nature and types of financial assistance offered by the school.

¶5. The University's website carried information on a John Waddell Scholarship, for which Aronson appeared to meet the qualifications. The website indicated it was a $4,000 scholarship, payable $1,000 a year, and included a waiver of out of state tuition.

¶6. Based upon this information, Aronson and his family requested an application package from the University. That package was received in October 1997, and included the 1997 school catalog.

¶7. The 1997 school catalog contained the following information on the Waddell scholarship:

The John Waddell Scholarship is offered to students who score 26 to 27 on the ACT test (1160-1222 on the SAT) and have a high school grade point average of 90% or higher. Priority consideration is given to those students who are fully admitted to the University by April 1, 1997. The award is for $4,000 over four years ($1,000 per year). The scholarship is available up to a maximum of four years, or for eight full-time, continuous semesters as an undergraduate student. To retain the scholarship, a 3.0 cumulative grade point average on all University of Mississippi course work is required. Non-residents of Mississippi who qualify for the Waddell Scholarship will also receive a scholarship which pays their out-of-state tuition fee.

¶8. Based upon this information, Aronson determined that he met the qualifications for the Waddell scholarship, and immediately completed and returned the application for admission. By letter dated November 6, 1997, the University advised Aronson of his admission.

¶9. After due consideration, Aronson decided that the Waddell scholarship made attendance at the University of Mississippi most compatible with his financial circumstances. He accordingly decided in April of 1998, that he would attend the University of Mississippi.

¶10. In order to preserve his placement at the University, Aronson, by checks dated April 6, 1998 and April 8, 1998, sent to the University the necessary fees for orientation and a dormitory room deposit. These checks were received and negotiated by the University.

¶11. At some point prior to the June 1998 freshman orientation, Aronson's stepfather called the University to insure that Aronson met the Waddell Scholarship requirements, and to verify the nature of the scholarship. He was informed that Aronson did in fact meet the requirements, and that it was a four year scholarship in the amount of $4,000, payable $1,000 a year, contingent upon maintaining a 3.0 grade average, and included a waiver of out-of-state tuition.

¶12. In June of 1998, Aronson attended freshman orientation at the University. At that time, he was given a copy of the 1998 University Catalog, which contained the following information on the Waddell Scholarship:

> The John Waddell Scholarship is offered to students who score 26 to 27 on the ACT test (1160-1222 on the SAT) and have a high school grade point average of 3.0 or higher. Priority consideration is given to those students who are fully admitted to the University by March 15, 1998 . The award is for $2,000 over four years ($500 per year). The scholarship is available up to a maximum of four years, or for eight full-time, continuous semesters as an undergraduate student. To retain the scholarship, a 3.0 cumulative grade point average on all University of Mississippi course work is required. Non-residents of Mississippi who qualify for the Waddell Scholarship will also receive a scholarship which pays their out-of-state tuition fee.

¶13. While at the University for orientation, Aronson's stepfather visited Cathy Morrisson, Assistant Director of Admissions, to determine the mechanism for distribution of the Waddell Scholarship. Ms. Morrisson informed him that the criteria had changed, and Aronson did not qualify for the out-of-state tuition waiver, and that the scholarship had been reduced to $2,000, payable over four years. This was the first notice that Aronson or his family had received that the out of state tuition waiver was no longer available.

¶14. Aronson's stepfather then discussed this matter with a number of University officials, who indicated that the change had been made after the 1998 school catalog was printed. They acknowledged that Aronson's understanding of the length of the scholarship and out-of-state tuition waiver, as contained in the 1997 and 1998 school catalogs was correct. They then indicated that the University would not adhere to that information.

¶15. The last University official to address this issue was the vice-chancellor for student affairs. When asked by Aronson's step father if he would give him a written reason for the University's failure to abide by its catalog, he responded no, because this was a matter of potential litigation.

¶16. Unable to resolve this matter within the University's administrative process, Aronson filed this action.

### DISCUSSION

¶17. The University's motion for directed verdict was in reality a motion to dismiss pursuant to Mississippi Rules of Civil Procedure 41(b). *Buelow v. Glidwell*, 757 So. 2d 216, (¶ 12)(Miss. 2000).

¶18. Such a motion is only proper, when the judge sitting as trier of fact, gives due consideration to all of the

evidence, and accords to it such weight and credibility as is appropriate, and having done so finds that the Plaintiff has failed to prove one or more of the elements of his claim. *Id.*

¶19. In reviewing a chancellor's decision to dismiss under M.R.C.P. 41(b) this Court will only reverse if that decision is manifestly wrong. *Taylor v. General Motors Corp.,* 717 So. 2d 747, (¶5) (Miss. 1998). In doing so, we defer to his findings of fact, *Hunt v. Coker*, 741 So. 2d 1011 (¶6) (Miss. Ct. App. 1999), but review *de novo* findings of law. *Id.*

¶20. Aronson's first issue, whether a contract existed, is dispositive; therefore it is the only matter which this Court will address.

¶21. The contractual relation between the student and university was first recognized by the Mississippi Supreme Court in *University of Miss. Med. Ctr.v. Hughes*, 765 So. 2d 528 (Miss. 2000).

¶22. Hughes alleged that the catalog of the University of Mississippi Medical Center represented a contract between the medical school and himself as a medical student. He argued that because it was a contract, his graduation requirements could not be changed once enrolled.

¶23. In addressing this contention, our Supreme Court noted that many other states had determined that a contractual relationship existed between the student and university, the terms of which, "may be derived from a student handbook, catalog, or other statement of university policy." It then stated:

> It is the conclusion of this Court, in keeping with the law of sister jurisdictions, that while the student-university relationship is contractual in nature, implicit in the university's general "contract" with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious.

¶24. In light of our Supreme Court's holding in *Hughes*, we are called upon to resolve three questions. Those questions are these: (1) when did the university-student contract come into being? (2) what were the terms of that contract? and (3) was the attempted change by the University a change in academic degree requirement, which it retained an implicit right to change?

### When did the university-student contract come into being?

¶25. At its simplest, a contract is reached when the parties agree upon the same thing, and at the same time. *Hunt v. Coker,* 741 So. 2d 1011 (¶9) (Miss. Ct. App. 1999).

¶26. Aronson initiated the process of contract negotiation by submitting his October 1997 application. The University made him a conditional offer in its letter of November 6, 1997. That conditional offer required (1) that Aronson successfully complete English IV with the required GPA, (2) submission of a final official high school transcript, and (3) proof of measles and rubella immunization.

¶27. Since Aronson did in fact enroll, this Court assumes that he met those conditions. Indeed, there is nothing in the record to suggest the contrary.

¶28. Aronson indicated his acceptance of that conditional offer by the submission of his orientation fees and dormitory room deposit in April of 1998.

### What were the terms of the student-university contract?

¶29. The terms of the student-university contract existing between Aronson and the University, would be that information placed in the public domain by the University at the time Aronson accepted the offer of conditional admission. The offer was accepted in April 1998, and the information then existing in the public domain was the 1998 University catalog.

¶30. As to the Waddell Scholarship, that information consisted of the following:

> The John Waddell Scholarship is offered to students who score 26 to 27 on the ACT test (1160-1222 on the SAT) and have a high school grade point average of 3.0 or higher. Priority consideration is given to those students who are fully admitted to the University by March 15, 1998. The award is for $2,000 over four years ($500 per year). The scholarship is available up to a maximum of four years, or for eight full-time, continuous semesters as an undergraduate student. To retain the scholarship, a 3.0 cumulative grade point average on all University of Mississippi course work is required. Non-residents of Mississippi who qualify for the Waddell Scholarship will also receive a scholarship which pays their out-of-state tuition fee.

> ### *Were the attempted changes in the contract academic, in nature, which gave the University the implicit unilateral right to alter them?*

¶31. In *Hughes*, while recognizing a contract between the student and the university, our Supreme Court noted that the contract carried the implicit right to change its academic degree requirements, so long as the changes are neither arbitrary, nor capricious.

¶32. This right is based upon the school's responsibility to properly exercise its educational responsibility. This implicit right to change academic requirements is inherent in the school's right to protect the integrity of its academic programs and to properly exercise its educational responsibility. *Mahavongsanan v. Hall*, 529 F. 2d 448, 450 (5th Cir. 1976).

¶33. There has been no suggestion, nor can we infer, that the reasons for this change were academic. Although there is no testimony on the subject, the trial court seemed to infer that it was a matter of finance saying:

> THE COURT: All right. The Court has heard the argument, it's sort of a unique case. I've read a lot of the case law that you've read. We are dealing with an institution of higher learning that is funded by the taxpayers dollars. The University of Mississippi, like all other public educational institutions survive year-by-year on money that is appropriated by the legislature. They do not know from year-to-year what money will be appropriated. Once that money is appropriated it goes to the institution of higher learning, and divvy it up among the sister educational institutions in the State of Mississippi. They make their budgets accordingly as to the amount of money that they receive. So in this Court's opinion the University of Mississippi would not be held to the same standard as General Motors or Texaco or any other public corporation, or any other private corporation, excuse me.

¶34. While noting the chancellor's remarks, this Court also notes that they are not supported by the evidence. While it is true that this is a public university, there is no evidence that this is a scholarship which is dependent upon legislative appropriations.

¶35. While that is not material to this Court's decision, we would likewise presume that such a decision was

motivated by matters of money rather than academic integrity.

¶36. The University argued, and the chancellor appears to have also placed great reliance on, the disclaimer contained on the first page of the University's 1997 and 1998 catalogs. The relevant portion of that disclaimer reads:

> This catalog is not an unchangeable contract but, instead, an announcement of present policies only. Implicit in each student's matriculation with the University is an agreement to comply with the University rules and regulations which the University may modify to exercise properly its educational responsibility.

¶37. The change enacted by the University was not designed to, and did not further the "educational responsibility" of the University. It is therefore, not subject to unilateral change once accepted.

¶38. We hold that Aronson and the University agreed to a four year scholarship. This holding is not inconsistent with the holding of *University v. Hughes,* 765 So. 2d 528 (Miss. 2000). I n rejecting the concept of a semester to semester contract between the student and the University, the Court said, "the protection afforded students comes from an implied contract right to continued enrollment free from arbitrary interference - - the protection afforded by the due process ".

¶39. This scholarship was to be paid incrementally at the rate of $500 per year, with a waiver of out of state tuition. The receipt of these incremental payments is predicated upon Aronson meeting very specific conditions. Those conditions are (1) to be a full-time undergraduate student of the university of Mississippi, (2) to maintain a 3.0 cumulative average on all university course work, and (3) retain continuous and uninterrupted status as a full-time undergraduate student. If Aronson honored these conditions, he had a reasonable expectation and an entitlement to receive the full four years of scholarship.

¶40. The dissent has misstated the majority opinion, both as to its holding and its net effect.

¶41. The dissent would have you believe that the majority holds that, "If the catalog says it, the student gets it." Under the thought process of the dissent, this would preclude a college from raising student tuition during a student's matriculation.

¶42. That is neither the holding, nor the effect of the majority opinion. Likewise, it is not the holding of *Hughes.*

¶43. Accordingly, this Court reverses the decision of the trial court, renders judgment for Aronson and remands this case to the chancellor to calculate damages, and enter an appropriate award for Aronson.

¶44. **THE JUDGMENT OF THE LAFAYETTE COUNTY CHANCERY COURT IS REVERSED, RENDERED, AND REMANDED TO DETERMINE DAMAGES. ALL COSTS OF THIS PROCEEDING ARE TAXED TO APPELLEE.**

> **BRIDGES, THOMAS, LEE, IRVING, MYERS, AND BRANTLEY, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J. CHANDLER, J., NOT PARTICIPATING.**

SOUTHWICK, P.J., DISSENTING:

¶45. University of Mississippi student Nicholas Aronson brought suit against his University for failure to honor what he considered to be commitments for a scholarship. After Aronson presented his evidence at trial, the chancellor dismissed the suit for failure to prove his claim. I would reverse because I find that there was an enforceable contract to provide the relevant scholarship. However, I would remand because I find that the only possible term of the contract is either one year or one semester.

## FACTS

¶46. Nicholas Mark Aronson, then a resident of Marietta, Georgia, began during his senior year of high school in 1997 to search for a university to attend upon graduation. Aronson and his step-father, Larry Shealy, researched the scholarship opportunities at each of the universities in which the teenager was most interested, taking into account his academic credentials. Aronson's stepfather testified that in May or June of 1997 the University of Mississippi's web site revealed that students with his credentials were qualified to receive the John N. Waddell Scholarship which provided $1,000 a year for four years. They also would receive a scholarship that would pay the difference between out-of-state and in-state tuition. At the University of Georgia, Aronson believed that he qualified for the Hope Scholarship which pays the tuition and fees to eligible Georgia residents. Aronson applied to both universities in October of 1997.

¶47. Shortly after sending his application to the University of Mississippi, Aronson received a copy in the mail of the University's 1997 catalog. This confirmed what he had discovered on the internet. The catalog explained the grade point and standardized test requirements, and that the Waddell scholarship was for $1,000 a year. Nonresidents of Mississippi who qualified for the scholarship would receive a scholarship that would pay out-of-state tuition. The catalog also contained this disclaimer printed on the first page:

> This catalog is not an unchangeable contract, but, instead, an announcement of present policies only. Implicit in each student's matriculation with the University is an agreement to comply with University rules and regulations which the University may modify to exercise its educational responsibility.

¶48. Aronson received an acceptance letter from the University of Mississippi admissions office on November 6, 1997. His stepfather testified that he then called the University of Mississippi financial aid office to make certain that his stepson would qualify for the John N. Waddell Scholarship. He was assured that based on Aronson's SAT score and grade point average, he would qualify for the scholarship with the out-of-state waiver.

¶49. Later that same month, Aronson received an acceptance letter from the University of Georgia. The letter stated that the University reserved the right to withdraw its offer of admission to students who did not respond to the orientation deadline, which was June 1, 1998. The letter did not mention the Hope Scholarship, and Aronson testified that although he met the qualifications for it, that he was never actually offered the scholarship by the University of Georgia.

¶50. In March 1998, Aronson decided that he would attend the University of Mississippi. He testified that this decision was heavily influenced by the availability of the Waddell Scholarship. Aronson notified the University of Mississippi that he would be attending orientation in June. He sent a room deposit and orientation fees, but no tuition payments were required.

¶51. Aronson, his mother, and his stepfather arrived at the University of Mississippi campus in early June 1998 for freshman orientation and to register for classes. While there, Aronson received a copy of the

University's 1998 catalog. It was from this catalog that Aronson learned that the terms of the John N. Waddell Scholarship had been changed from $4000 over four years to $2000 over four years. The catalog still stated that the scholarship would cover out-of-state tuition costs. The identical disclaimer appeared as had been in the 1997 catalog.

¶52. While orientation was proceeding, Aronson's stepfather sought more information from the admissions office on the status of the Waddell Scholarship. He was informed that the terms of the scholarship had changed as shown in the new catalog, and that it also would no longer cover the out-of-state tuition differential. He then met with an official in the financial aid office. The changes in the terms of the scholarship were confirmed. It was explained that the provision about out-of-state tuition was mistakenly carried forward from the 1997 catalog to the 1998 catalog.

¶53. Aronson still chose to attend the University of Mississippi. On September 28, 1998, Aronson signed the University's financial aid policies and conditions form acknowledging and accepting the John N. Waddell Scholarship with a value of $250.00 per semester, with no mention of an out-of-state tuition waiver. Aronson still attends the University.

¶54. Aronson filed a complaint in the Chancery Court of the First Judicial District of Hinds County against the University of Mississippi on December 17, 1998, alleging breach of contract and promissory estoppel. A change of venue was granted to Lafayette County Chancery Court. Trial began on April 20, 2000. Following Aronson's case in chief, the chancery court granted the motion to dismiss for failure to establish a claim under a breach of contract theory or under a theory of promissory estoppel. This appeal followed.

## DISCUSSION

¶55. Aronson attempted to prove claims both for breach of contract and promissory estoppel. I look at each claim in order to determine whether adequate proof was presented.

### I. Breach of Contract

¶56. Aronson contends that a contract existed between himself and the University, the terms of which were outlined in the 1997 catalog. He specifically claims that the University catalog was an offer of the John N. Waddell Scholarship, which he accepted by committing to attend the University, attending orientation and sending in deposits for his room and orientation fees.

¶57. I divide the necessary contract analysis into these three parts: (1) had a contract been formed before Aronson was informed of the scholarship changes; (2) if such a contract existed, what were its terms; and (3) if the University was bound to certain scholarship provisions, for what period did that obligation apply? More simply put, was there a contract, what was its terms, and how long did it last?

### A. When is the student-university contract formed?

¶58. The foundational Mississippi precedent as to the relationship between students and universities is quite recent and concerned students that had been enrolled for several years. *University of Mississippi Med. Ctr. v. Hughes*, 765 So. 2d 528 (Miss. 2000). The relationship is definitely contractual in nature. *Id.* at 535. A central but not sole source for the terms of the contract is the university catalog. *Id.* at 534-35. Many courts that have considered the issue have used the terminology that the catalog does not form an integrated contract, meaning that the terms may be derived from a variety of sources and not just the

catalog. Kevin P. McJessy, *Contract Law: The Proper Framework for Litigating Educational Liability Claims*, 89 Nw. U. L. Rev. 1768 (1995); *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977), *cert. denied*, 435 U.S. 971 (1978).

¶59. Since the students in *Hughes* had long been enrolled at the University Medical Center, the need to identify the prerequisites for contract formation did not arise. A significant issue here, though, is whether Aronson and the University entered a contract binding in some manner prior to his arriving for orientation in June 1998. There are various methods used to explain the essentials of a contract. Sometimes it is said that there must be an offer, acceptance, and consideration. *Gatlin v. Methodist Med. Ctr.*, 772 So. 2d 1023, 1029 n.3 (Miss. 2000). A listing that accounts for more variables is this: (1) mutual assent, (2) consideration, (3) at least two contracting parties, (4) sufficiently definite terms so that a court can determine if a breach occurs, (5) legal capacity of each contracting party, and (6) no legal prohibition precluding the formation of a contract. John E. Murray, Jr., Murray on Contracts § 28 (3d. ed. 1990).

¶60. I will not consider all these issues immediately. The definiteness of the relevant scholarship terms will be discussed in a later section. Aronson's capacity to enter a binding contract as a minor has not been made an issue, and regardless his mother and stepfather had the same representations made in the catalog to them and presumably signed relevant forms, none of those documents being considered below as necessary to introduce into evidence. There are no public policy or other legal prohibitions involved in this agreement. Thus mutual assent (or offer and acceptance) and consideration remain the key issues for us.

¶61. A catalog, school bulletins, and other written materials given prospective students have all been considered as the materials that comprise the contract once it is formed. David Davenport, *The Catalog in The Courtroom: From Shield to Sword?* 12 J.College & University L. 201, 208 (1985). There is no reason to exclude university web page information, which may be among the most widely disseminated representations. The solicitation of applications by the University caused Aronson to present his credentials and request admission. On November 6, 1997, the University informed Aronson that his application had been accepted. Various other materials were referenced in the letter as being sent him at that same time, but they are not in the record.

¶62. No monetary consideration was submitted at that time. There is nothing in the record to suggest that the University required any deposit to hold the place open for the student. All that was paid prior to Aronson's arrival for orientation in June 1998 was a $50 orientation fee and a $50 deposit for a dorm room, each submitted in April 1998. There is no argument by the University that Aronson was required to submit any other payments prior to his arrival for orientation in June 1998. The evidence was that tuition did not need to be paid until September.

¶63. When the University sent its acceptance in November 1997, Aronson was not obligated to attend. Indeed, no student ever is legally obligated to attend a university even after paying tuition, though the right to a refund may be limited or nonexistent. Does the absence of an obligation upon the accepted applicant mean the school also is not bound? The absence of mutuality of obligation is raised by the University to indicate that there was no contract at least until Aronson paid his tuition. In a precedent that analyzed the binding nature of an option, the court held that the unilateral discretion of one party about whether to exercise the option did not make the option unenforceable. The Supreme Court found that consideration was needed, but "mutuality of obligation is not, unless the want of mutuality would leave one party without a valid consideration for his promise." *Clinton Serv. Co. v. Thornton,* 233 Miss. 1, 9, 100 So. 2d 863, 866

(1958). The holder of the option in that suit had paid for the right to decide whether to lease certain property, an option that he might not exercise during the life of the agreement but which was binding all the same.

¶64. Using the *Clinton Service* terminology, Aronson had requested and the University had granted him the option to attend, a right that he could consider along with any others that he had received - or even attend no institution at all. No deposit was requested to hold this option open. There is caselaw in Mississippi that without consideration being paid, an option remains just an offer, revocable at will if that is done prior to its exercise by the promisee. *McCorkle v. Loumiss Timber Co.*, 760 So. 2d 845, 850-51 (Miss. Ct. App. 2000)*,* citing *Bancroft v. Martin*, 144 Miss. 384, 109 So. 859, 860 (1926). Aronson argues that his forbearance of other opportunities can also constitute consideration. Restatement (Second) of Contracts § 71 (1981).

¶65. We need not resolve whether consideration in nonmonetary form existed. It is sufficient that consideration under the contract for which an offer and acceptance existed since November 1997 was paid in April 1998, prior to any notice of change in the offered terms. Though the two payments were small, fifty dollars each, and though they concerned an orientation session and housing, the payments were consideration under the contract that had existed in inchoate form between the parties. Orientation and a room were not bargained-for rights independent from his admission to the University. Aronson did not need to be oriented to or have a room at a university that he could not attend. The two payments were the only consideration that was yet due, and Aronson presented it to the University. With that final element of consideration in place, the contract became effective.

¶66. I find that a contract was formed at least by April 1998. I now turn to defining the terms that existed and were enforceable under it.

### B. What were the contract terms?

¶67. Though there was a contract prior to Aronson's arrival at the University in June 1998, it was an unusual one. The *Hughes* court held that while the student-university relationship was in fact contractual, that a university reserved the right to change academic degree requirements during the term of the contract as long as the changes were neither arbitrary nor capricious. *University of Miss. Med. Ctr. v. Hughes*, 765 So. 2d at 535. The academic change in *Hughes* was to require medical students to pass certain standardized tests in order to continue to be enrolled. *Id.* at 529-30.

¶68. *Hughes* means that even though a contract is involved, it is one that at least in some respects can be changed by a university. The precedents *Hughes* cited concerned the discretion that universities must have to change educational degree requirements. *Id*. at 534-35. Nothing in the case directly addresses changes to financial obligations. *Hughes* provides the structure, namely one of contract, but not the answer for the analysis that we must undertake.

¶69. Accepting that some unilateral changes in contract terms can be made by a university, I cannot agree that all imaginable changes are valid. If that is so, then there is in reality no contract. *Hughes* makes clear that the relationship between student and institution is in fact contractual. If the contract has no enforceable terms then the classification is counterfeit. I read *Hughes* to hold that a university has substantial discretion to vary terms, but a court must analyze the proposed change in light of relevant legal principles. Since *Hughes* solely concerned the considerations for changes to academic requirements, there was no need to

explore just what those principles were in other areas. We must, however.

¶70. I start with the proposition that since the relationship is contractual, there must be something akin to a meeting of the minds between the parties on the terms of the agreement. There should be sufficiently definite terms as to know if there has been a breach, which was one of the six elements of contract formation previously described. Murray on Contracts § 28. What *Hughes* and many other cases from around the country hold is that certain terms are to be implied as necessary for the functioning of this unusual contract. Among those implied terms is the right of the University to change academic requirements, since the school must exercise its expertise and experience to adjust the educational program to make it as effective as possible. Whether that means adding an extra language requirement to a degree program or imposing a new examination, such changes are valid unless they can be shown to be arbitrary or capricious. *Hughes*, 765 So. 2d at 533.

¶71. What other courts have found to establish what is in the contract that is outlined by the catalog and other documents but not totally controlled by them, is the reasonable expectations of the parties. Virginia Davis Nordin, *The Contract to Educate: Toward a More Workable Theory of the Student University Relationship*, 8 J. College & University L. 141, 145-49 (1982); *Mangla v. Brown Univ.*,135 F.3d 80, 83 (1st Cir. 1998), citing *Giles v. Howard Univ*., 428 F. Supp. 603, 605 (D.C.C. 1977). These should be seen as the objective expectations of reasonable parties in the college admission context, who have exchanged the catalog and other information that are in evidence. This is not the subjective expectation of the specific student and specific university administrators.

¶72. In *Hughes*, the Mississippi court was concerned with the reasonably clear imperative of the University to adjust academic requirements. An applicant or student reasonably should expect some measure of change in those terms. Outside of the academic requirements arena, is there a similar anticipatable imperative that even after offer, acceptance, and consideration, that financial aspects of the contract be changeable within the unfettered discretion of the University? Or, is there for the life of the contract an agreed-upon price?

¶73. There have been some precedents from other jurisdictions on this issue. Most have concerned increases in future years to the tuition that was set out in the catalog. For example, one university projected specific tuition increases, then explained the potential for even larger ones:

> Every effort will be made to keep tuition increases within these limits. However, it is not possible to project future economic data with certainty, and circumstances may require an adjustment in this estimate.

*Basch v. George Washington Univ*., 370 A.2d 1364, 1365 (D.C. 1977). The court found that the statement was too qualified to create a binding obligation for the university to refrain from higher than forecast increases unless it could present adequate economic data. *Id.* at 1366-67.

¶74. Another court permitted a medical school to increase tuition from $6,000 to $9,000 after students had been accepted and paid a deposit but before they arrived for classes. That was because there was a specific disclaimer in the school bulletin that tuition charges were subject to change, which put the applicants on notice. *Prusack v. State,* 498 N.Y.S.2d 455, 456-57 (1986).

¶75. The *Prusack* court distinguished another New York precedent that did not permit a tuition increase,

finding that the university in that earlier case had not included a specific disclaimer in a catalog or other materials to put students on notice of an increase in tuition even before they arrived for classes. The prior case said that the college could not increase tuition since the published catalog was unambiguous, and the college would not be allowed to correct tuition charges in light of late budgetary developments. *Silver v. Queens College of City Univ.*, 63 Misc. 2d 186, 187, 311 N.Y.S.2d 313, 314 (Civ. Ct. 1970). The student in *Silver* had paid his tuition in June prior to classes starting in the fall, then was sent an additional bill to reflect the new tuition rate. *Id.* A similar refusal to permit a tuition increase was given by a much earlier decision cited by Aronson in this appeal. *Niedermeyer v. Curators of State Univ.*, 61 Mo.App. 654 (Kan. Ct. App.1895). There too no specific disclaimer appeared in the documents provided students by the college.

¶76. These are different state courts addressing difficult issues. The precedents may not all be consistent. Yet I find persuasive that as a contract, the agreement between a student and a university, once supported by consideration, cannot have the most basic matter of agreed price altered unilaterally for the period covered by the contract. If a university has made it plain that there is no established price for the agreement, as was the case in *Prusack*, then there has not been a unilateral increase from the agreed tuition when the university raises the cost of attendance. However, when the package of tuition and school-offered scholarships has been offered and accepted without reservation of the right to alter, a contract on those terms is binding.

¶77. The University of Mississippi argues that a disclaimer in the catalog that was sent Aronson provides that sort of flexibility. The catalog contained this paragraph printed on the first page:

> This catalog is not an unchangeable contract, but, instead, an announcement of present policies only. Implicit in each student's matriculation with the University is an agreement to comply with University rules and regulations which the University may modify to exercise its educational responsibility.

¶78. Certainly there is no specific reference to tuition or to any other financial matter. The second sentence, relating to a student's need to comply with University rules and regulations, is inapplicable. As to the first sentence, the natural meaning of "policies" would not immediately appear to include the cost of the education. An argument can be crafted that a relevant policy might be the one undergirding the amount of and eligibility for different scholarships. I do not conclude that the Mississippi Supreme Court would necessarily apply to a contract such as this its extraordinarily narrow reading of disclaimers in other areas, such as in disclaiming liability for injuries a contracting party may suffer. *See Turnbough v. Ladner*, 754 So. 2d 467, 470 (Miss. 1999) (pre-printed contract, no negotiation before signing, and broad waiver of liability results in strict construction of disclaimer against maker). Even if cases such as *Turnbough* are limited in their application, a university that wishes to remove any reasonable expectation by a student that he has already been told what it will cost to attend the university, should do so with far greater clarity. For example, the student could be told " the reference to a specific amount of tuition, fees, and other charges is an estimate and may need to be altered prior to the time that tuition and fees are paid." I find no applicability for the 1997 catalog's disclaimer to the matter of tuition.

¶79. Such clarity may interrupt the unremittingly positive image that schools wish to project of the advantages of attending. This could alter the competitive position that a school otherwise would have with others that do not attempt to retain the right to alter tuition after acceptance and a deposit, but before the beginning of classes. Nonetheless, if the school-student relationship is actually a contractual one, some

notice is needed that this term that is fundamental to the understanding of the parties may also be changed.

¶80. Two significant financial considerations were changed when Aronson appeared for orientation. One was halving the annual value of the Waddell Scholarship. The other was in removing the waiver of out-of-state tuition. I conclude that if the university itself provides the scholarship, it cannot reduce its amount and effectively increase the tuition without reasonable notice in the "contract." Similarly, to retract an agreement with an out-of-state student that he can attend at the lower in-state tuition rate is even more directly increasing the tuition that must be paid. That cannot be done, absent suitable notice that the university retains such a right. One party to the contract may not make a unilateral decision to change the principal cost of performance.

¶81. I consider one final matter regarding the applicable terms. The contract was formed no later than in April 1998, and the only catalog that had been sent Aronson at the time controls for the length of the contract. That means that when Aronson was given the next year's catalog when he arrived for orientation, it was too late for the University to change the cost of admission. Otherwise, a university that is bound by its catalog-contract could unilaterally just issue a new contract.

### C. Length of contract

¶82. The majority of the court has concluded that the terms of the scholarship was binding for four years. I cannot agree.

¶83. I conclude that the University became bound to the financial terms of the scholarship and out-of-state tuition waiver no later than in April 1998 when Aronson paid the deposits required under his contract with the University. Aronson of course wants the University to be bound for four years.

¶84. Some courts have held that such contracts as these are enforceable only for a semester. That is because of the conclusions that each semester a new contract is formed when the next tuition installment is paid. *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 114 (Minn. 1977). A few courts, including in the 1895 decision that Aronson relies upon most avidly, have concluded that there is but one contract for the life of the student's enrollment. *Niedermeyer v. University of Missouri*, 61 Mo. App. at 662.

¶85. I return to the reasonable expectations of parties who enter a contract for attendance in a four-year program at a university. I cannot find that a student, absent some explicit assurances, would have a reasonable expectation that what he is being informed about the school in any respect is an assurance regarding all four years of the standard period for obtaining an undergraduate degree. *Hughes* speaks to the absolute necessity of discretion to make changes to academic requirements during the course of a degree program. There is no justification to make tuition and scholarships nearly so uncertain. Still, to conclude that a catalog that makes no assurances of unchangeable costs of the education does nonetheless guarantee permanence is unrealistic. It therefore is not a *reasonable* expectation of the parties. If tuition can be raised, the effective amount of tuition can be raised by lowering school-offered scholarships.

¶86. The majority finds that this was a four year contract because the catalog said that the scholarship was for four years. There is arguable simplicity to that argument, but with respect, I find it to be simplistic instead. The problem is, this agreement is only contractual *in nature*. Unlike a normal contract case, we are not faced solely with the dual tasks of searching for a provision and then applying it by its terms. I agree that

the catalog states that the scholarship in a certain amount was for four years. But that is too facile a means to resolve this much more nuanced question.

¶87. As explained in *Hughes* and the other cases already discussed, contract terminology is used for the relationship between students and colleges but the agreement is unlike the traditional contract. Within limits, a university has broad discretion to change the terms between its students and itself as institutional needs arise. *University of Miss. Med. Ctr. v. Hughes*, 765 So. 2d at 534-35. Mentioned already is that other courts, after recognizing that the contract is given structure by the catalog and other documents but is not totally controlled by them, have determined relevant rights by considering the reasonable expectations of the parties. We too should be engaged in a careful interpretation of whether the provision in question meets those expectations, not just whether the number "four" appears.

¶88. What in effect the majority is holding is that the University is bound for all four years regarding every financial aspect in the catalog and other publications given a student if that financial matter is ever expressed in a four year equivalent. If a university states that tuition was $10,000 a year or $40,000 for the normal undergraduate period, that insignificant phrasing choice makes it a guarantee. If the catalog says it, the student gets it. No other court in a hundred years has reached that conclusion. We may be blazing a new trail, but we should not abandon all the direction given by the precedents.

¶89. I find that it is not within the reasonable expectation of any party that, absent guarantees to the contrary, the amount of tuition and fees, the price of a dormitory room, or any other financial representation made in a catalog is a contractual right for four years. Objective people making objective decisions do not have irrational expectations. Hopes, perhaps, but not reasonable beliefs. I find that the question in this case is what less than four years would be within the reasonable expectations of the parties.

¶90. However, the irrationality may be mine, since the majority has found otherwise. At most, though, surely this is factual question that should be remanded. The factual issue is not what the catalog says - beyond a doubt, the catalog referred to four years. The issue that we should be resolving is what were the parties reasonably entitled to expect? Several matters affect the expectations from which legal consequences flow. The assurances are in a "contract" that is published annually, i.e., they appear in the 1997 catalog, not a semester's catalog. The scholarship is expressed in the catalog as an annual amount and a four year total; it is not shown in semester equivalents. Nonetheless, tuition is owed on a semester basis.

¶91. The University has argued that there was no contract at all; Aronson has argued that the enforceable contract was for four years. The contract length between zero and four years was not addressed by the trial court in ruling for the University. I find it appropriate on this essentially factual matter to remand to the trial court for a determination.

## II. Promissory estoppel

¶92. Aronson has received the entirety of what he seeks under a contract theory. In addition, he also argues that he established a claim under promissory estoppel. He specifically argues that he reasonably relied upon the University of Mississippi's representation that he would receive the John N. Waddell Scholarship according to its terms as listed in the 1997 catalog, and that his reliance caused him to miss the deadline for attending orientation at the University of Georgia and the benefit of the Hope Scholarship. I examine this issue as an independent basis for the claim.

¶93. The Mississippi Supreme Court defined the doctrine of promissory estoppel this way:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite or substantial character on the part of the promisee and which does induce such action and forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Brewer v. Universal Credit Co.*, 192 So. 902, 904 (1940) (quoting Restatement of Contracts, § 90). Therefore, conduct by one party that reasonably induces another to rely to his detriment, can result in enforceable rights. *Shogyo Int'l Corp. v. First Nat'l Bank of Clarksdale*, 475 So. 2d 425, 428 (Miss. 1985). However, this unusual contract that has been recognized between universities and applicants is closely analogous to the doctrine of promissory estoppel. The thrust of the designation of what terms are subject to change and which can be enforced is to decide what are the reasonable expectations of the parties. That is essentially deciding what justifiable reliance can arise from the catalog, and what is not justifiable.

¶94. I find that promissory estoppel creates no different result, but just would apply different terminology. In many respects that terminology is more appropriate, as calling the catalog a "contract," then allowing wide changes to it, distorts normal contact analysis. The opposite also is risked, which is to lure a court into uncritical application of contract rules.

### III. Damages and Interest

¶95. We reverse because the chancery court found that there was no binding contract to provide the $1000 Waddell Scholarship and a waiver of out-of-state tuition. A majority of the court holds that the length of that contract was four years. I find that we should send back for the trial court to determine the reasonable expectations of the parties as to length.

¶96. On the evidence in the record, it would appear that the breach of the agreement would result in damages of $3602 per year, being the extra $3102 paid for out-of-state tuition, and the fact that $500 was paid under the Waddell Scholarship instead of $1000. That would have been the amount of damages for each year. Aronson would be entitled to that amount for any years of the effective contract for which he has already paid tuition, and would be entitled to specific performance of the agreement for any years for which tuition has not yet been paid.

¶97. Aronson seeks attorney's fees, for which there is neither a statutory nor a contractual basis.

¶98. Aronson also sought prejudgment interest.

> Prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or when the denial of a claim is frivolous or in bad faith. No award of prejudgment interest is allowed where the principal amount has not been fixed prior to judgment. Prejudgment interest is not imposed as a penalty for wrong doing; it is allowed as compensation for the detention of money overdue. For prejudgment interest to be awarded, the party must make a proper demand for the interest in the pleadings, including the date that it was allegedly due.

*Preferred Risk Mut. Ins. Co. v. Johnson*, 730 So.2d 574, 577 (Miss. 1998). Aronson's original complaint sought prejudgment interest. Though no bad faith on the University's part has been asserted or shown, Aronson's claim was liquidated, namely, the specific dollar amount of the unprovided portion of the

scholarship. Therefore prejudgment interest at eight per cent could be allowed. Miss. Code Ann. § 75-17-1 (1) (Rev. 2000). The interest rate applicable to the judgment itself, i.e., post-judgment interest, is set by the trial judge if the contract contains no interest rate: "All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint." Miss. Code Ann. § 75-17-7 (Rev. 2000).

¶99. I would have the issues regarding interest evaluated by the chancellor during the course of his consideration of the length of this contract. M.R.A.P. 37.

**McMILLIN, C.J., JOINS THIS SEPARATE OPINION.**